# STATE OF MICHIGAN

# COURT OF APPEALS

In re G. M. SHRINER, Minor.

UNPUBLISHED
June 7, 2018

No. 340633
St. Clair Circuit Court
Family Division
LC No. 15-000414-NA

Before: SERVITTO, P.J., and GLEICHER and STEPHENS, JJ.

PER CURIAM.

The circuit court terminated respondent-mother's parental rights to her daughter, GS (d/o/b March 18, 2009), under MCL 712A.19b(3)(c)(*i*), (c)(*ii*), (g), and (j). Despite 18 months of services to assist respondent with ending the cycle of domestic violence in her home, respondent continued to deny and justify her fiancé's abusive actions. Record evidence supported that GS suffered emotional trauma as a result of her mother's relationship. And although respondent had participated in individual counseling, completed parenting classes, and engaged in therapeutic parenting time sessions with GS's counselor, respondent still did not understand how to protect and bond with her daughter. We affirm.

## I. BACKGROUND

The Department of Health and Human Services (DHHS) took GS into care in November 2015, based on evidence that the child had witnessed her mother's live-in boyfriend, Gerald Adams, physically and emotionally abuse her mother. Respondent admitted to a Child Protective Services (CPS) worker that Adams had choked her and that GS would "get in the middle of the physical altercations to protect her." This was especially troubling because GS was developmentally delayed, cognitively impaired, and exhibited emotional distress with behaviors such as self-harming and acting aggressively toward others.

On November 15, 2015, respondent admitted the allegations in the jurisdictional petition and signed a parent/agency agreement. Respondent was required to attend counseling, parenting classes, and domestic violence programming. Most importantly, respondent was required to "obtain/maintain safe, suitable, *independent* housing." (Emphasis added.) A week later at a family team meeting, respondent reported that she was afraid Adams would kill her if she tried to leave him. Shortly thereafter, respondent informed a caseworker that Adams had locked her out of their home, leading her to summon the police.

-1-

At a hearing on February 8, 2016, in respondent's presence, the caseworker stated, "DHHS does not recommend [respondent] be in a relationship with Mr. Adams." GS's therapist testified that the child ripped out her hair, choked herself, and rocked herself aggressively. The therapist spoke to the parenting class coordinator and reported, "if mom continues to choose to be in a relationship where we have ongoing domestic violence that service is not going to be successful." At the conclusion of the hearing, the court warned respondent that her relationship with Adams was "voluntary" and "if it's . . . to the point where he's . . . impacting your ability to parent your child, which it certainly appears based on the report that I'm getting, then you've got to take steps to end that relationship to protect your child." A continuing relationship was "clearly a concern for . . . the future placement of [GS]," the court advised.

During a May 2, 2016 hearing, again in respondent's presence, the caseworker described that respondent "ha[d] been made aware on several occasions that if she wants to maintain a relationship with Jerry Adams . . . he needs to start participating in services." However, at a recent "wrap around meeting," respondent showed "a lack of understanding how remaining in a relationship with domestic violence is [sic] present how it can negatively affect [GS] in her ability to feel safe in the home." At that meeting, respondent indicated that she has also caused incidents of domestic violence in the home and stated her belief "that it is only natural to put your hands on someone when you're upset." The parenting time supervisor further observed that respondent "is constantly bringing up [Adams] to [GS] and constantly more focused on how this is affecting [Adams] then how it is affecting her or [GS] at this time."

By September 2016, respondent seemingly came to understand that she needed to make new housing arrangements. Although she was still living with Adams, she had submitted an application for Section 8 housing. This turnabout was likely motivated by GS's September 13 report to her foster mother, therapist, and pediatrician that Adams had sexually abused her. CPS was unable to substantiate the claim and the prosecutor declined to bring charges. As a result, respondent indicated that she did not believe the allegations. Respondent further asserted that she would not allow the DHHS to tear her family apart and that she would continue her relationship with Adams.

By the end of October, respondent and Adams decided to plan together for GS's return. The pair took an online domestic violence course and Adams enrolled in parenting classes. Through her counsel, respondent admitted that she and Adams had domestic violence issues in the past, but no criminal charges had ever been brought against Adams. By that time, respondent and Adams were engaged to be married. Respondent informed GS of the marriage plans during a supervised visit. GS quickly shut down and stopped communicating with respondent. Respondent insisted that GS viewed Adams as her "daddy" and that she was a "daddy's girl" and simply tired that day. Ultimately, at an October 31, 2016 hearing, respondent's attorney objected to the DHHS's continued recommendation that respondent secure independent housing away from Adams. The court rejected the challenge and adopted the DHHS's recommendations as presented.

At a January 30, 2017 hearing, the caseworker asserted that she "has had multiple conversations with" respondent "about the present concern of reunification with [GS] possible [sic] being returned to an environment that domestic violence has occurred [sic]," and that the caseworker "recommends that" mother and daughter have "independent housing" away from

Adams. The court ordered continued participation in domestic violence counseling as it would not place GS back in the home unless there was "a very minimum risk of any further domestic violence."

Despite completing an online domestic violence course together, at a March 30, 2017 wrap-around meeting, Adams made "controlling statements to [respondent] and became visibly angry at her for being late to a parenting time visit." The caseworker "had to intervene" and advise Adams that he was acting inappropriately. The caseworker reported, "It's clear the domestic violence issues between the two have not been resolved." Moreover, as described at an April 17, 2017 hearing, an intensive in-home service provider, Jessica Leenknegt, had "observed some domineering behavior from Mr. Adams. She reports that Mr. Adams attempts to have control over tasks [respondent] needs to complete on her own." Respondent had complained to the provider about Adams's behavior in the past but then would "justify his actions." Leenknegt felt that domestic violence was an ongoing problem. After respondent advised the caseworker that she would continue her relationship with Adams and intended to marry him, the worker requested that the couple add respondent to the lease. In this way, Adams could not simply evict respondent. The couple did not follow through with the landlord, however. And following a visit supervised by the child's therapist, GS told the therapist "that she did not feel safe returning to her mother's home," "she did not think that her mother would keep her safe in the home," "that living with . . . Adams is not safe," and "that she would like to remain in the foster home."

On May 4, 2017, the DHHS filed a supplemental petition seeking termination of respondent's parental rights. The petition cited respondent's failure to benefit from services as evidenced by her remaining in an abusive relationship, a situation she knew GS could not be returned to.

During the termination hearing, the caseworker and service providers testified regarding the roller coaster of respondent's relationship with Adams. Evidence was also presented regarding the trauma exhibited by GS, including self-harming, wetting herself, and tantrums. GS's therapist and the caseworker described that GS seemed disconnected from respondent during parenting time. She would not make eye contact with her mother or let her mother be affectionate. GS's therapist found the lack of bond between mother and child "rises to the level of disturbing." Moreover, respondent continued to discuss Adams and their wedding plans with GS despite that GS would become upset and close herself off from respondent after. GS continued to regress following visits, banging her head against the wall or wetting herself.

Leenknegt testified that she heard conflicting accounts from the caseworkers and respondent regarding whether the DHHS required respondent to leave Adams in order to regain custody of her daughter. However, Leenknegt noted that respondent never admitted that domestic violence occurred in her home and this was a barrier to reunification. She further noted that toward the end of the proceedings, "there was a rocky period in the relationship due to infidelity, so that was somewhat concerning." Leenknegt witnessed an argument between respondent and Adams during which Adams threatened to evict respondent from their home. Overall, Leenknegt opined that respondent still had a long way to go before she would be able to recognize the characteristics of a healthy relationship.

The caseworker testified that respondent "refuses to choose between" Adams and GS, but had actually "chosen Mr. Adams" by continuing to live with him against all advice. GS asked the caseworker to tell respondent that she feared Adams, but respondent told the caseworker it simply was not an issue. The caseworker opined that respondent had not sufficiently benefitted from services to safely parent GS. Indeed, respondent's domestic violence counselor observed signs of a physical altercation between respondent and Adams as late as May 12, 2017, after which respondent refused to leave the home.

At the termination hearing, respondent claimed for the first time that she suffered from flashbacks during which she would try to hurt herself. The incidents of domestic violence witnessed by GS and others were actually Adams's attempts to restrain her during these flashbacks. During one such incident, respondent testified, Adams accidentally choked her and broke two of her ribs.

Respondent also described the various efforts she and Adams made to assist GS before her removal from the home. GS was violent toward respondent, self-harmed, and wet herself. With counseling and school resources, those behaviors had abated. The seeming lack of a bond the caseworkers and therapists observed at parenting time was simply a symptom of GS's cognitive and developmental impairments. Respondent also continued to insist that GS never expressed a fear of Adams and that GS misses her "daddy."

Respondent called several relatives as witnesses to GS's development as a small child and the nature of the mother-child bond. Respondent's mother testified that respondent had suffered from flashbacks since she was a little girl. Adams also took the stand to describe his efforts to restrain respondent during these flashbacks. Unlike respondent, Adams denied that he ever broke respondent's ribs and blamed that injury on a horseback riding accident.

Following this evidence, the DHHS recalled the caseworker to the stand. She testified that respondent had never claimed to any caseworker assigned to the case that she suffered from flashbacks or that Adams tried to restrain her to stop her from hurting herself.

Ultimately, the court found respondent's belatedly raised excuses and defenses incredible and terminated respondent's parental rights to GS. Respondent now appeals.

## II. STATUTORY GROUNDS

Respondent challenges the evidentiary support for the statutory grounds leading to termination. Pursuant to MCL 712A.19b(3), a circuit court "may terminate a parent's parental rights to a child if the court finds, by clear and convincing evidence" that at least one statutory ground has been proven by the DHHS. MCR 3.977(A)(3); *In re Trejo*, 462 Mich 341, 350; 612 NW2d 407 (2000). When termination is sought in a supplemental petition based on new grounds, the DHHS must present legally admissible evidence in support. *In re DMK*, 289 Mich App 246, 258; 796 NW2d 129 (2010). We review a circuit court's factual finding that a statutory termination ground has been established for clear error. *In re Rood*, 483 Mich 73, 90-91; 763 NW2d 587 (2009). "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *In re Moss*, 301 Mich App 76, 80; 836

NW2d 182 (2013) (quotation marks and citation omitted). "Clear error signifies a decision that strikes us as more than just maybe or probably wrong." *In re Williams*, 286 Mich App 253, 271; 779 NW2d 286 (2009).

In terminating respondent's parental rights, the court cited MCL 712A.19b(3)(c)(*i*), (c)(*ii*), (g), and (j), which provide:

> (c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds either of the following:

> (*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

> (*ii*) Other conditions exist that cause the child to come within the court's jurisdiction, the parent has received recommendations to rectify those conditions, the conditions have not been rectified by the parent after the parent has received notice and a hearing and has been given a reasonable opportunity to rectify the conditions, and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

> * * *

> (g) The parent, without regard to intent, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.

> * * *

> (j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent.

The evidence supported that the conditions that led to adjudication, domestic violence and respondent's inability to recognize that violence and protect her child from it, continued to exist at the time of the termination hearing. Respondent had participated in counseling and domestic violence programs. She completed parenting classes and attended therapeutic parenting time sessions. The DHHS provided intensive in-home services to respondent on a weekly basis. Despite these efforts, respondent showed little benefit. Eighteen months into the proceedings, respondent retracted her initial claims and suddenly denied that any domestic violence had ever occurred in her home. Respondent continued to ignore her child's fears and the serious trauma GS suffered, declaring against all evidence that GS loved Adams like a father. "[I]t is not enough to merely go through the motions; a parent must benefit from the services offered so that he or she can improve parenting skills to the point where the children would no longer be at risk in the parent's custody." *In re Gazella*, 264 Mich App 668, 676; 692 NW2d

708 (2005). The record supports that respondent did not benefit from the extensive services provided in this case and therefore the court had grounds to find that respondent could not rectify the conditions that led to adjudication within a reasonable time. Termination of respondent's parental rights was thereby supported under factor (c)(*i*).[1]

In challenging the termination, however, respondent contends that it was unfair to base the termination on her decision to remain with Adams when the court never ordered her to leave. This is a disingenuous interpretation of the record. From the beginning, the court ordered respondent to find independent housing. Throughout the proceedings, the caseworkers advised respondent in open court that they would not return GS to a home rendered unstable and unsafe by domestic violence. Respondent was present at hearings and meetings where service providers and caseworkers reported observing acts of domestic violence, both physical and emotional. Yet, respondent persisted in denying the abuse and continuing her relationship. And respondent was not unaware of the requirement that she live separately from Adams to regain custody of GS. In the face of this requirement, respondent expressly told the caseworker that she would not let the DHHS break apart her family. Accordingly, respondent's decision to remain in Adams's home was proof that the conditions that led to adjudication persisted.

The evidence also supports termination under factor (g). Providing proper care and custody for a child requires providing the right type of care for the particular child. A child with special needs may need more intensive care than a child without disabilities. Here, respondent described the special services she secured for GS before her removal. However, respondent remained in a home marked by violence with her daughter who acted out aggressively toward others. Respondent conceded at one point that GS placed herself between Adams and respondent during physical altercations. Although respondent did not understand the dynamics, GS responded by acting out aggressively toward others, self-harming, and wetting herself. And as noted, respondent's failure to benefit from services and recognize the trauma caused to her child evidenced that she would be unable to provide proper care and custody in the future.

Similarly, termination was supported under factor (j) as respondent still could not provide a safe home environment for GS. As late as May 2017, a service provider observed injuries on respondent consistent with a physical assault. Adams was domineering and controlling in Leenknegt's presence and at a wrap-around meeting including several workers. Yet, at the termination hearing, respondent suddenly claimed that no abuse had ever occurred. Rather, she insisted, Adams was required to use force against her to prevent her from hurting herself during flashbacks. There is no record that respondent ever shared her history of flashbacks with her therapist. Moreover, respondent continued to have no insight into the emotional ramifications of the abusive environment on her child. Despite GS's own protestations, respondent still believed

---

[1] The new ground cited in the petition to support termination under factor (c)(*ii*) was GS's allegation that Adams sexually abused her. We need not consider whether termination was supported on this ground as it was supportable under factor (c)(*i*). It is therefore not outcome determinative that CPS did not substantiate the allegations or that Adams was never charged with criminal sexual conduct.

that Adams was GS's "whole world.  Her daddy is her whole world, she is a daddy's girl."  This supported that respondent would continue to be unable to protect GS if the child was returned to her care.

Respondent contends that the court improperly terminated her parental rights simply because she was the victim of abuse in violation of *In re Plump*, 294 Mich App 270, 273; 817 NW2d 119 (2011).  However, as in *Plump*, neither the adjudication nor the termination of respondent's parental rights was based solely on respondent's position as a domestic violence victim.  Respondent received 18 months of services to help her escape domestic violence.  Instead, respondent dug in her heels, created an elaborate story for how her injuries occurred, and insisted that her family be made whole with Adams at its head.  In doing so, respondent ignored significant advice on how to best help her daughter.

## III. BEST INTERESTS

Respondent further contends that termination of her parental rights was not in GS's best interests.  "Once a statutory ground for termination has been proven, the trial court must find that termination is in the child's best interests before it can terminate parental rights."  *In re Olive/Metts*, 297 Mich App 35, 40; 823 NW2d 144 (2012), citing MCL 712A.19b(5).  "[W]hether termination of parental rights is in the best interests of the child must be proven by a preponderance of the evidence."  *Moss*, 301 Mich App at 90.  The court should weigh all the evidence available to it in determining the child's best interests.  *Trejo*, 462 Mich at 356-357.  Relevant factors include "the child's bond to the parent, the parent's parenting ability, [and] the child's need for permanency, stability, and finality. . . ."  *Olive/Metts*, 297 Mich App at 41-42 (citations omitted).  "The trial court may also consider . . . the parent's compliance with his or her case service plan, the parent's visitation history with the child, [and] the children's well-being while in care. . . ."  *In re White*, 303 Mich App 701, 714; 846 NW2d 61 (2014).  The advantages of the child's foster placement over placement with the parent are a relevant consideration.  *In re Foster*, 285 Mich App 630, 634-635; 776 NW2d 415 (2009).  The court may also consider the likelihood that "the child could be returned to her parent's home within the foreseeable future, if at all."  *In re Frey*, 297 Mich App 242, 248-249; 824 NW2d 569 (2012).  At this stage in the proceedings, the best interests of the child in having "a normal family home is superior to any interest the parent has."  *Moss*, 301 Mich App at 89.

The record amply supports that termination of respondent's parental rights was in GS's best interests.  Respondent's attempts to assist her daughter before her removal were admirable.  However, it is clear that respondent never grasped the true nature of GS's needs.  Respondent argues that mother and child shared a bond and that GS's apparent distance from her mother was just GS's nature.  GS's therapist did not agree and the child shared a more open relationship with her foster family, belying respondent's claims.  After several months of services and counseling, and even with the assistance of GS's therapist, respondent still did not understand that her speaking about Adams and the upcoming nuptials was a trigger for GS to shut down emotionally.  The parent-child bond simply was not as pictured by respondent.

GS further indicated that she did not want to return to respondent's care as long as respondent remained with Adams.  GS expressed her fear of Adams but respondent would not

listen. It would not be in the child's best interests to return her to a home in which she does not feel safe.

GS instead expressed a desire to remain in her foster home, on the other hand. The service providers noted that GS's foster parents effectively and compassionately managed GS's behaviors. GS was affectionate with her foster parents and foster siblings and her coping skills were improving. Toward the end, GS even happily ran to her foster parents after visits and would not interact with respondent during the visits.

There was no likelihood that GS could be returned to respondent within a reasonable time considering that, despite all the services provided and advice tendered, respondent chose to remain with Adams. Respondent placed her unhealthy romantic relationship and her own desires over the needs of her child. Therefore, the circuit court did not clearly err in finding that termination was in GS's best interests.

We affirm.

/s/ Deborah A. Servitto
/s/ Elizabeth L. Gleicher
/s/ Cynthia Diane Stephens